# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **DOROTHY M. SPECK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:02-0415** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on cross-Motions for Judgment on the Administrative Record. Docket Entry Nos. 13 and 15.

For the reasons stated below, the undersigned recommends that this case be REMANDED.

## I. INTRODUCTION

Plaintiff filed her applications for DIB and SSI on July 1, 1999, alleging that she had been disabled since June 9, 1999, due to poor vision, back and knee problems, nerves, depression, hypertension, diabetes, and a "light stroke." Docket Number 11, Attachment ("TR"),

1

TR 57-59; 258-259. *See also, e.g.,* TR 62. Plaintiff's applications were denied both initially (TR 33-36; 260-262) and upon reconsideration (TR 37-41; 43-47). Plaintiff subsequently requested (TR 50) and received (TR 272-297) a hearing. Plaintiff's hearing was conducted on May 15, 2001, by Administrative Law Judge ("ALJ") Donald E. Garrison. TR 272-297. Plaintiff and vocational expert ("VE"), Deborah Rice, appeared and testified. TR 273.

On September 18, 2001, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 17-25. Specifically, the ALJ made the following findings of fact:

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(b) and 416.920(b).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §§ 404.1527 and 416.927).

7.  The claimant has the following residual functional capacity: occasionally lift and carry 10 pounds, less than 10

2

pounds frequently, with the option to sit or stand at will, with occasional grasping with the left hand, requiring no postural activities (climbing, balancing, stooping, crouching, kneeling, crawling), requiring no extreme left peripheral vision and taking into account moderate loss of ability to sustain concentration, persistence and pace due to pain.

8. The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

9. The claimant is a "younger individual" (20 CFR §§ 404.1563 and 416.963).

10. The claimant has "a limited education" (20 CFR §§ 404.1564 and 416.964).

11. The transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

12. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR §§ 416.967).

13. Although the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.25 as a framework for decision-making, there are significant number of jobs in the national economy that she could perform. Examples of such jobs include work as machine operator (1,000 positions in TN), surveillance systems monitor (166 positions in TN), cashier (750 positions in TN), handpacker (400 positions in TN), and inspector (800 positions in TN).

14. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

TR 24-25.

On November, 21, 2001, Plaintiff timely filed a request for review of the hearing

decision. TR 13. On March 1, 2002, the Appeals Council issued a letter declining to review the

3

case (TR 10), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

Plaintiff alleges disability due to poor vision, back and knee problems, nerves, depression, hypertension, diabetes, and a "light stroke." *See, e.g.,* TR 62.

On April 22, 1998, Plaintiff was examined by Dr. Jon H. Levine for complaints of "peripheral numbness and tingling in her feet." TR 115. Dr. Levine noted that Plaintiff was a 40 year old female who had been diabetic for 8 years and overweight most her adult life. *Id.* Dr. Levine informed Plaintiff on how to better handle her diabetes, and discussed the need for a diet and exercise program. *Id.*

On May 5, 1998, Plaintiff visited the Retina-Vitreous Associates complaining of blurred vision while reading. TR 160. The doctor noted that he saw "diabetic retinopathy and raised blood vessels" upon examining Plaintiff's eyes. *Id.* The doctor also noted that Plaintiff sometimes saw "floaties." *Id.*

On May 20, 1998, Plaintiff returned to Dr. Levine for a follow-up examination. TR 114. Dr. Levine encouraged Plaintiff to be "aggressive with her diet and exercise program." *Id.*

On August 18, 1998, during another follow-up examination, Dr. Levine noted that: Plaintiff complained of "some burning in the soles of her feet even though she [was] relatively numb in this area"; Plaintiff experienced "some nausea throughout the day"; Plaintiff's "weight

4

remained constant"; and Plaintiff appeared to "potentially be heading toward nephrotic syndrome." TR 113. Dr. Levine noted that Plaintiff had blood work done for "hemoglobin A1c, renal, and electrolytes as well as liver function." *Id.* Dr. Levine increased Plaintiff's Accupril to 80 miligrams per day, asked her to restart Glyburide, and gave her a prescription for Reglan. *Id.*

On December 15, 1998, Plaintiff again visited Dr. Levine, complaining of weight gain, "significant" fluid retention, and "difficulty lying flat because of shortness of breath." TR 112. Dr. Levine stated that he would "add Glucophage 500 mg bid to her regimen" and "perhaps ... stop her insulin." *Id.* Dr. Levine further noted that Plaintiff "had blood work today for hemoglobin A1c, lipids, liver function, and renal status." *Id.*

On December 18, 1998, Plaintiff was admitted to Centennial Medical Center with a left hemiparesis which "gradually improved with time." TR 125. Dr. Christopher Hoffman noted that Dr. Ronald Wilson had confirmed that Plaintiff had had a "cerebrovascular accident." TR 130. Dr. Wilson noted that Plaintiff had a combination of "left facial numbness, left upper extremity weakness and left lower extremity hyper-reflexia." TR 127. Dr. Wilson stated that these conditions were "consistent with a stroke involving some cortical right middle cerbral artery structures or internal capsule on the right side." *Id.* Dr. Wilson reviewed Plaintiff's MRI which showed "no atrophy and brain tissue looked good with no evidence of significant small vessel disease."[1] *Id.* Dr. Wilson recommended that Plaintiff have "an MRI of her brain over the next 24 to 72 hours, carotid Doppler study, and ECHO cardiogram and anticoagulation studies." TR 128. At the time of discharge, Plaintiff was "significantly better," although she continued to have "only partial arm function" and "persistent numbness" along the left base. TR 125-126.

---

[1] Dr. Wilson did not indicate the date on which the MRI was ordered or performed.

On December 23, 1998, Plaintiff was examined by neurologist Dr. David Uskavitch. TR 154. Dr. Uskavitch noted that Plaintiff had been admitted to the hospital the previous week for evaluation of a right hemispheric stroke. *Id.* Plaintiff underwent a cranial CT scan which showed no hemorrhage. *Id.* Dr. Uskavitch ordered an MRI scan of Plaintiff's brain, which revealed "[a] tiny, punctate focus of abnormal T2 hypertensity within the left frontal white matter"; "no evidence of cerebral infarction or intracranial mass"; "normal" sized ventricles; "no congenital malformations"; and "no evidence of aneurysm or vascular malformation." TR 156.

On January 26, 1999, Plaintiff returned to Dr. Uskavitch for a neurologic evaluation. TR 153. Dr. Uskavitch noted that Plaintiff had "some residual numbness on the left" and "some mild left grip strength weakness." *Id.* Plaintiff underwent an MRI which showed "no evidence of stroke with a normal intracranial MRA." *Id.*

On March 17, 1999, Plaintiff visited the Horizon Medical Group because she had fallen and injured her left knee.[2] TR 144. Plaintiff underwent an X-ray which did not reveal a fracture. *Id.* Plaintiff returned to the Horizon Medical Group on June 5, 1999, complaining of problems with her left knee. *Id.* Dr. Ben Shoemaker noted that she had "swelling in the knee." *Id.* He further noted that there was "no erythema" and that Plaintiff did have "crepitus on range of motion." *Id.* Dr. Shoemaker changed Plaintiff's medication to Indocin 25 miligrams. *Id.*

On June 8, 1999, Plaintiff returned to the Horizon Medical Group, complaining of pain in her knee cap. TR 143. The physician noted that Plaintiff's medication was refilled. *Id.*

On June 19, 1999, Plaintiff was scheduled for an MRI to be conducted on the following

---

[2] Plaintiff also visited the Horizon Medical Group from December 1998 through December 1999 for pain in her ears, pain in her throat, pain and stiffness in her neck, effusion of her right ear, blisters on her tongue, coughing, and chills. TR 135-146.

6

Monday.  TR 142.  Dr.  Shoemaker noted that Plaintiff had "crepitus in the left knee," and that her knee was "warm to touch with slight swelling."  *Id.*

As scheduled, Plaintiff underwent an MRI on June 21, 1999, which revealed a "complex tear medial meniscus posterior horn"; "knee joint degeneration"; "intact cruciate and collateral ligaments"; and "small knee joint effusion."  TR 132.

Plaintiff apparently underwent arthroscopic surgery on her left knee in July 1999 (TR 256), although there are no medical records in the Administrative Record concerning that surgery.

On July 21, 1999, Plaintiff again visited the Retina-Vitreous Associates for troubles with her vision.  TR 159.  The doctor noted that Plaintiff had "a lot of night blindness" which made driving at night "impossible."  *Id.*

On August 9, 1999, Dr. Uskavitch, performed a physical examination of Plaintiff.  TR 161.  Dr. Uskavitch noted that Plaintiff's "neck was supple," her "speech was fluent," her "optic discs were sharp," her "deep tendon reflexes were symmetric," and her "ankle jerks were absent."  TR 161-162.  Dr. Uskavitch's examination of Plaintiff's limbs revealed "normal tone and no focal weakness."  TR 162.  Dr. Uskavitch further noted Plaintiff's history of "a possible lacunar sensor stroke with good recovery."  *Id.*

On August 25, 1999, Dr. Robert Lane, a licenced psychologist, performed a psychological evaluation of Plaintiff at the request of the Tennessee Department of Human Services, Division of Rehabilitative Service.  TR 163.  In the Psychological Report, Dr. Lane noted that Plaintiff "seemed as though she was intentionally making mistakes" during the evaluation.  TR 164.  Dr. Lane opined that Plaintiff was "not significantly limited in her ability to understand and

7

remember instructions." *Id.* He further noted that Plaintiff demonstrated that she had no loss of language or motor skills, and that she had the ability to plan, initiate, sequence, and monitor complex behavior. *Id.* Dr. Lane concluded, however, that because Plaintiff "did not appear to make an honest attempt to participate in the mental status examination," it was "not possible to make an accurate statement concerning her ability to sustain concentration and persistence, have appropriate social interaction, be aware of normal hazards and take precautions, travel unaccompanied in unfamiliar places, use public transportation, set realistic goals, and make plans independently of others." *Id.*

On September 1, 1999, Dr. Bruce A. Davis examined Plaintiff. TR 166. Dr. Davis diagnosed Plaintiff with "Class III Extreme Obesity," and noted her diabetes, cardiovascular disease, musculoskeletal disease, psychological condition, and problems with kidney stones. TR 168. Dr. Davis also assessed Plaintiff's work-related phsyical capabilities, finding that Plaintiff could "occasionally" lift/carry less than 50 pounds; "frequently" lift/carry less than 25 pounds; stand/walk for 2 hours in an 8-hour workday; and sit for 8 hours in an 8-hour workday. *Id.* Dr. Davis noted that Plaintiff had postural limitations including "limited" bending and squatting, and that Plaintiff had "other physical/environmental limitations" including "limited heat/humidity, climbing/heights, [and] limited finger dexterity/grip." *Id.*

On September 2, 1999, Dr. William Regan completed a Mental Residual Functional Capacity Assessment of Plaintiff.[3] TR 175. Dr. Regan indicated that Plaintiff was unable to perform detailed tasks, but could perform simple tasks. TR 177. He further indicated that

---

[3] The name of the person who signed this RFC is illegible. Plaintiff avers in her Brief that it was Dr. William Regan (Docket Entry No. 14, p. 4), and Defendant does not dispute this averment.

8

Plaintiff was unable to relate to the general public.[4] *Id.* Dr. Regan opined that Plaintiff was "markedly" limited in: her "ability to understand and remember detailed instructions"; her "ability to carry out detailed instructions"; and her "ability to interact appropriately with the general public." TR 175-176. Dr. Regan also opined that Plaintiff was "moderately" limited in: her "ability to maintain attention and concentration for extended periods"; her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods"; and her "ability to respond appropriately to changes in the work setting." *Id.* Dr. Regan further noted that Plaintiff was "not significantly limited" in: her "ability to remember locations and work-like procedures"; her "ability to understand and remember very short and simple instructions"; her "ability to carry out very short and simple instructions"; her "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; her "ability to sustain an ordinary routine without special supervision"; her "ability to work in coordination with or proximity to others without being distracted by them"; her "ability to make simple work-related decisions"; her "ability to ask simple questions or request assistance"; her "ability to accept instructions and respond appropriately to criticism from supervisors"; her "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes"; her "ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness"; her "ability to be aware of normal hazards and take appropriate precautions"; her "ability to travel in unfamiliar places or use public transportation"; and her "ability to set realistic goals or make plans independently of others." *Id.*

---

[4] The handwritten assessment is partially illegible.

Case 3:02-cv-00415   Document 18   Filed 07/28/05   Page 9 of 29 PageID #: 9

Dr. Regan also completed a Psychiatric Review Technique form on September 2, 1999. TR 179. Dr. Regan noted that Plaintiff "often" experienced "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner,"and that Plaintiff had "slight" limitations with regard to her "restriction of activities of daily living" and "difficulties in maintaining social functioning." TR 186. Dr. Regan also noted that Plaintiff "once or twice" experienced "episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)." *Id.*

On September 15, 1999, Dr. Martin I. Perlmutter examined Plaintiff for complaints of "vision problems, back and leg pain, and problems with [her] hand and feet."[5] TR 188. Dr. Perlmutter's diagnoses of Plaintiff were "Drusen" and "Diabetes with unspecified complications." TR 189.

On October 8, 1999, Dr. Bruce Davis and Dr. Robert S. Francis examined Plaintiff. TR 190. Dr. Davis noted Plaintiff's 5 year history of "worsening [...] pain across the lower back with bilateral leg numbness, [and] weakness aggravated by activity [and] position." *Id.* Dr. Davis also noted that Plaintiff was "slow changing position on/off the table." *Id.* He further noted that Plaintiff had "normal" knee flexion and "slow and unsteady" gait maneuvers, and the report appears to indicate that Plaintiff could not squat.[6] *Id.* Dr. Francis noted that Plaintiff's vertebral body alignment was "normal," and that her interval disc spaces were "well maintained." TR 193.

On October 14, 1999, Dr. James B. Mills completed a Physical Residual Functional

_____

[5] Dr. Perlmutter did not indicate which hand Plaintiff complained about.

[6] The information in contained in Dr. Davis' report is partially unascertainable because of illegible handwriting and undecipherable symbols.

Capacity Assessment of Plaintiff. TR 194. Dr. Mills opined that Plaintiff could "occasionally" lift and/or carry 20 pounds, and "frequently" lift and/or carry10 pounds, and that Plaintiff could stand and/or walk for "about 6 hours in an 8-hour workday" and sit (with normal breaks) for "about 6 hours in an 8-hour workday." TR 195. Dr. Mills further opined that Plaintiff was "unlimited" in her ability to push and/or pull, but that Plaintiff was "occasionally" limited in postural limitations including climbing, balancing, stooping, kneeling, crouching, and crawling.[7] TR 196.

On January 5, 2000, Frank Edwards, Ph.D., completed another Psychiatric Review Technique form of Plaintiff. TR 202. Dr. Frank's "primary concerns" were Plaintiff's physical condition and weight. TR 203. He noted that Plaintiff reported attending church, managing her money, and socializing with friends, but that she did "little else due to [her] physical problems [and] size." Id. Dr. Edwards also noted that there was "no evidence of worsening condition." Id. He opined that Plaintiff had "slight" limitations with regard to her "restriction of activities of daily living" and "difficulties in maintaining social functioning," but that she "seldom" experienced "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner." TR 209. Dr. Edwards further opined that Plaintiff "never" experienced "episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)." Id.

On January 6, 2000, Dr. Lawrence Schull completed a Physical Residual Functional Capacity Assessment of Plaintiff. TR 211-218. Dr. Schull noted that Plaintiff had a gait limp

_____

[7] The physician made additional handwritten notes that are illegible.

with "unsteadiness" in attempting gait maneuver, "full motion" and "good strength" in the neck, "normal" knee flexion, and "no reflex abnormalities." TR 213. He opined that Plaintiff could "occasionally" lift and/or carry 20 pounds; "frequently" lift and/or carry 10 pounds; stand or walk about 6 hours in an 8-hour workday; and sit (with normal breaks) for about 6 hours in an 8-hour workday. TR 212. He further opined that Plaintiff was "unlimited" in her ability to push and/or pull. *Id.* Dr. Schull noted that Plaintiff was "occasionally" limited in postural limitations including "climbing, balancing, stooping, kneeling, crouching, [and] crawling," but that she had no manipulative, visual, communicative, or environmental limitations. TR 213-216.

On January 26, 2000, Plaintiff was examined by Dr. Jeffrey P. Lawrence of Premier Orthopaedics and Sports Medicine. TR 226-227. Plaintiff underwent an X-ray of her right knee which revealed "marked arthritic changes of the patellofemora joint"; "bone on bone changes and lateral subluxation of the patella"; and "some mild degenerative changes in the medial and lateral compartment." TR 227.

On February 2, 2000, Plaintiff visited Dr. Lawrence complaining of "a lot of grinding, popping, soreness, and stiffness in her knee." TR 227. Upon examination, Dr. Lawrence noted that Plaintiff's right knee was "not any better." *Id.* Dr. Lawrence noted that Plaintiff reported that she had been in the hospital over the previous weekend, and that she was told that she had suffered a "mild stroke." *Id.* Dr. Lawrence further noted that he needed to see what the status was concerning Plaintiff's stroke and whether she would be a surgery candidate. *Id.* Dr. Lawrence discussed the risks of surgery with Plaintiff. *Id.*

On March, 15, 2000, Plaintiff returned to Dr. Lawrence complaining of pain in her right knee. TR 254. Plaintiff expressed interest in a patella realignment procedure. *Id.* Dr. Lawrence's impressions were "[l]ateral sublexed patella" and "[c]hondromalacia of patella." *Id.*

12

Dr. Lawrence noted that Plaintiff needed clearance from Dr. Graham prior to proceeding with her surgery. *Id.*

On April 5, 2000, Plaintiff again returned to Dr. Lawrence complaining of pain in her right knee. TR 254. Dr. Lawrence noted that Plaintiff had "crepitation in her patella," some "mild tracking of her patella," and "pain with range of motion of her knee." *Id.* Dr. Lawrence noted that Plaintiff had seen Dr. Graham, who had released her and indicated that she had no "neurologic contraindications to surgery." *Id.* Dr. Lawrence again discussed the risks of surgery with Plaintiff. *Id.*

In a surgical note dated April 14, 2000, Dr. Lawrence stated: "[l]eft knee arthroscopy, arthroscopic partial lateral meniscectomy. Arthroscopic tricompartmental chondroplasty. Arthroscopic removal of multiple cartilaginous loose bodies. Partial medial and lateral meniscectomies."[8] TR 224.

On April 19, 2000, Plaintiff returned to Dr. Lawrence for a follow-up examination after her arthroscopy. TR 221. Plaintiff's physical examination revealed that Plaintiff had "motion 0-130°," and that the incision "look[ed] good." *Id.* Plaintiff's sutures were removed. *Id.* Plaintiff requested and received a cane, Percocet, and a handicap sticker. *Id.*

A clinical record from Dr. Lawrence dated May 3, 2000, indicated that Plaintiff "fell two weeks ago and hit her head on a truck bumper twisting her knee." TR 221. Plaintiff was prescribed Naprosyn, which she took until her follow-up examination with Dr. Lawrence in July

---

[8] While this surgical note refers to Plaintiff's left knee, it appears from other material in the record that Dr. Lawrence performed arthroscopic surgery on Plaintiff's right knee on April 14, 2000. TR 222, 254-256. It further appears, as discussed above, that Plaintiff had previously had arthroscopic surgery on her left knee in July 1999. TR 256. Dr. Lawrence's "Clinical Record" refers to the 1999 surgery, but there are no medical records in the Administrative Record from that surgery.

13

2000.  *Id.*

A clinical record from Dr. Lawrence dated July 5, 2000, noted that Plaintiff reported falling on the previous Sunday, and that she complained of "pain and swelling" in her knee.  TR 220.  On September 5, 2000, Plaintiff returned to Dr. Lawrence and complained that her knee felt like it wanted to "give on her."  *Id.*  Dr. Lawrence conducted a physical examination of Plaintiff, which revealed that she had "good motion of the knee," "diffuse tenderness," and "mild effusion." *Id.*  Plaintiff was injected with Aristospan and given a prescription for Vicodin.  *Id.*

On October 18, 2000, Plaintiff informed Dr. Lawrence that the injection had helped her right knee for approximately 1 week, but that her knee remained "very painful," especially when she was "up on it."  TR 229.  Plaintiff informed Dr. Lawrence that her left knee felt "okay."  *Id.* Dr. Lawrence noted that he would attempt to obtain approval for Plaintiff to receive Synvisc for both knees, and that Plaintiff had received Cortisone injections.  *Id.*

Dr. Lawrence noted that Plaintiff's right and left knees were "sterilely injected" with "2cc Synvisc for degenerative arthritis" on November 8, 2000.  TR 229.  Dr. Lawrence noted that there were "no complications."  *Id.*  Dr. Lawrence also noted that Plaintiff underwent the same procedure on November 15 and November 22, 2000.  *Id.*

On April 23, 2001, Plaintiff again visited Dr. Lawrence.  TR 257.  Dr. Lawrence noted that she had "a lot of problems with her right knee," and that her left knee was "doing okay."  *Id.* Plaintiff underwent an X-ray, which revealed that her right knee showed "marked degenerative changes, joint space narrowing, and osteophyte formation."  *Id.*  Plaintiff's right knee was "sterilely injected" with Depo-Medrol and Marcaine.  *Id.*

### B.  Plaintiff's Testimony

Plaintiff was born on December 7, 1957, has a tenth grade education, and has not obtained

14

her GED, received any special job training, or obtained any additional licenses, degrees, or certifications. TR 276-277. Plaintiff testified that she could read and write, and that she had a driver's license. TR 276. Plaintiff testified that she had worked part-time as a school patrol person. *Id.* Plaintiff also testified that she had "Team Care" health insurance. TR 277.

Plaintiff testified that she had not worked since June 9, 1999, and that she had not been involved in any vocational rehabilitation program. TR 277. Plaintiff reported that she had a 19 year old son and custody of her 2 grandchildren, aged 7 and 5, all of whom lived with her in her household. *Id.* Plaintiff testified that she had lost her house and that her source of income since the middle of 1999 had been help from her family. *Id.*

Plaintiff testified that her primary care physician was Dr. Reggie Anderson in National City, and that her orthopedic specialist was Dr. Jeffrey North. TR 277. Plaintiff stated that she was going to have a right knee replacement because her knee was rubbing "bone to bone." TR 278. Plaintiff stated that she had undergone all possible "injections," as well as "arthroscopic surgery," and that she was "down to the last straw." *Id.* Plaintiff testified that a knee replacement might not completely heal her, but might reduce her pain. *Id.* Plaintiff testified that the surgery was not yet scheduled, and she acknowledged that it might not help her because of her weight and the stress that her weight put on her legs. *Id.*

Plaintiff further testified that she had visited a diabetic specialist, Dr. John Levine, and an "eye doctor," whose name she could not recall. TR 278. Plaintiff testified that she wore glasses when she watched television or read. *Id.* While referencing her left field of vision, Plaintiff stated, "I can't see things that [*sic*] coming around over here until they get to about right there on this side of the face." *Id.* Plaintiff testified that the doctor told her that this was due to the "mini" strokes that she had suffered. *Id.* Plaintiff testified that she did not usually drive at night because

15

the lights hurt her eyes, and that she usually had one of her children drive her at night. TR 279. Plaintiff testified that with her glasses, she could see things that were close, and that she had no problem seeing at a distance without her glasses. *Id.* Plaintiff further testified that when it was raining, she could not see. *Id.* Plaintiff stated that she needed bifocals, but that she could not afford them. *Id.*

Plaintiff testified that she was able to stand for "about five minutes at the most" and was able to sit for "at least maybe ten minutes," because her legs would get numb and her lower back would begin to hurt. TR 279-280. Plaintiff stated that the pain was "always there," and that she did not like to take a lot of pain medication because it made her "feel like some zombie." TR 280.

Plaintiff testified that she was able to lift "about five pounds." When asked if she was "able to bend and pick up stuff," Plaintiff responded that she could not. TR 280. Plaintiff testified that she tried not to bend, squat, or use the stairs, because it was "better" for her knees. *Id.* Plaintiff testified that she could hear her knees "crunch" and that they would "hit bone to bone." *Id.* Plaintiff also testified that her right knee was worse than her left. *Id.*

When asked if her ability to use her left arm or hand was "limited," Plaintiff responded that it was limited because she had been shot in the left arm, which severed a radial nerve. TR 280. Plaintiff reported that her grip was weaker in her left hand than in her right hand. *Id.* Plaintiff testified that, prior to a procedure in which her nerve was "put ... back together," she would have to "flop [her] hand over." *Id.* When asked if the lack of full use of her left hand interfered with her recent jobs as a pharmacy technician and an assistant manager, Plaintiff responded, "I can't take and like pick up stuff, because I tend to lose the grip that's in that hand." TR 281.

16

Plaintiff testified that she experienced "constant" pain in her legs and the lower part of her back. TR 281. Plaintiff stated that rotating pain medication and Tylenol eased, but did not eliminate, her pain. *Id.* On a scale from 0 to 10, Plaintiff reported that her pain was a 5 when she took her pain medication. *Id.* Plaintiff further testified that a side effect of the medication was that it made her drowsy. *Id.*

When asked if she took medication for her "emotions or nerves," Plaintiff testified that she took "Zantac," as prescribed by Dr. Anderson. TR 282. Plaintiff testified that it helped her, but that it made her drowsy. *Id.* Plaintiff further testified that she had not attended any mental health therapy, and that Dr. Anderson had also prescribed Prozac for her. *Id.*

When asked what aggravated her pain, Plaintiff responded, "If I sit, if I sit for a long time or even if I stand, I mean, it's always there. Like I said, it's not, it's not always gone, it's not never [*sic*] easy. I mean, it just takes the edge off of it." TR 283. Plaintiff testified that to help alleviate her pain, she used a heating pad or ice pack, lay down, or propped up her leg. *Id.*

Plaintiff also testified that Dr. Lawrence had attempted to alleviate her pain with Cortisone shots, but that this raised her blood sugar levels, and that, as a diabetic, she then had to take more insulin. TR 283. Plaintiff testified that she was insulin dependent and that she checked her blood sugar levels after taking her medication. TR 283-284. Plaintiff testified that her blood sugar levels generally ran "between 240 to almost 300." TR 284.

Plaintiff testified that she could not do "a lot" of exercise because of her leg, but that she could walk a "certain distance." TR 284. Plaintiff stated that she had to watch her feet when she walked because she did not have feeling in the bottom of her feet. *Id.* Plaintiff testified that Dr. Lawrence had advised her to try and avoid walking up and down steps, and she stated that she could not bend because it "wears" on her knees. *Id.*

17

Plaintiff testified that she had been diagnosed with diabetes when she was 35 years old. TR 285. Plaintiff testified that she believed that her vision had been damaged because of her diabetes, that she only had 1 kidney, and that her kidney functioned at 50 percent. TR 284. Plaintiff testified that her vision became blurry when her blood sugar levels were elevated. *Id.* Plaintiff further testified that she became "real dizzy" and "constantly" had a "dry mouth." TR 285. Plaintiff reiterated that she did not have any feeling in her feet, and she opined that it was a result of poor blood circulation from being diabetic. *Id.* Plaintiff also noted that she experienced numbness in her hands. *Id.*

Plaintiff testified that it had been a year since she was last examined by Dr. Levine. TR 285. Plaintiff testified that Dr. Anderson had been treating her diabetes since that time, and that she was then taking Glucophage, Avandia (Phonetic), and insulin. TR 285-286. Plaintiff further testified that she began giving herself insulin when she was 35 years old. TR 286.

Plaintiff testified that she followed a 1,200 calorie per day diet that involved eating 3 meals and refraining from eating sugar. TR 286. Plaintiff testified that she had a list of food that she was not allowed to eat, and that she counted calories when she could, but that she "knows exactly what to eat." *Id.*

Plaintiff testified that her last job as a pharmacy technician ended because she could not stand on her legs. TR 286. Plaintiff also mentioned that she fell while working on that job. *Id.* Plaintiff testified that the job required constant moving, and that she eventually would have to sit down. TR 286-287. Plaintiff testified that she felt that, after she had to sit down more often, she was treated differently, and that the other employee thought that Plaintiff was receiving special treatment, so Plaintiff felt like she had to quit. *Id.*

Plaintiff testified that she was diagnosed with a "mini stroke" 2 years prior, and reported

18

that she also had a stroke the year before that one.  TR 287.  Plaintiff testified that, as a result of her stroke, she had numbness in the right side her face, and that she experienced loss of vision. *Id.*  Plaintiff testified that she was able to use her arms and legs, and that her speech had been restored.  TR 287-288.  Plaintiff testified that she could not remember things. TR 288.

Plaintiff testified that she drove a car, but that she usually only drove to her daughter's house, which was 10 minutes away.  TR 288.  Plaintiff testified that she was able to watch television, but not for long periods of time because she could not sit for very long, and her eyes would begin to hurt.  *Id.*  Plaintiff testified that she did not read because reading strained her eyes and she could not see the pages without bifocal lenses.  *Id.*

Plaintiff testified that she did not cook, clean, or do laundry, and that her daughter helped her with the cleaning and the laundry.  TR 288.  Plaintiff testified that she was able to make her bed because it was high so she did not have to bend or stoop.  TR 289.  Plaintiff stated that she did not do any outdoor work.  *Id.*

Plaintiff testified that she was able to dress herself, fix her hair, bathe herself, and engage in other similar activities, but that she had difficulty picking up and putting on her shoes.  TR 289. Plaintiff testified that she did not attend church, school, or community events.  *Id.*  Plaintiff testified that she did not go visit friends, but that friends did come visit her.  *Id.*  Plaintiff testified that she used to cross-stitch as a hobby, but that her vision deterioration had prevented her from cross-stitching for the couple of years prior to her hearing.  *Id.*  Plaintiff further testified that she was not involved in any outside activities, clubs, or organizations, and that if she went grocery shopping, she had to ride in a buggy provided by the store.  TR 289-290.

Plaintiff testified that she had to lie down 4 or 5 times a day for 30 minutes because she had to prop up her knees and put ice packs on them to ease the pain.  TR 290.  When asked why she

could not perform a "sit-down job," Plaintiff testified that she could not sit down for long periods of time because it made her legs numb and her back would begin to hurt. *Id.* Plaintiff testified that Dr. Lawrence had restricted her from walking, bending, and going up and down steps. *Id.* Plaintiff testified that she watched a "little" amount television for recreation, and that she kept busy by walking on the porch and playing solitaire. TR 290-291. Plaintiff testified that she also watched her grandchildren play, went riding with her niece, and went to the park with her niece and grandchildren. TR 291.

Plaintiff stated that she had "orthoscopic surgery" on both knees in "about" April 2000. TR 291. Plaintiff testified that the surgery helped the pain in her left knee, but not in her right knee. *Id.* Plaintiff stated that there was a bone spur in her right knee, and that she could hear it grind in her knee when she walked. *Id.* Plaintiff stated that her bone occasionally "shift[ed] to the side" and "could almost bring [her] to the floor." TR 291-292.

### C. Vocational Testimony

Vocational expert ("VE"), Deborah Rice, also testified at Plaintiff's hearing. TR 275-276; 292-297. The VE classified Plaintiff's most recent work experience as a pharmacy technician as an entry-level, semiskilled job with a light exertional level, and her previous job as an assistant at a drug store as skilled with a light exertional level. TR 275.

The VE noted that the responsibilities of the assistant at a drug store position would include preparing budgets, overseeing accounts receivable and payable, preparing departmental reports, analyzing seasonal trends and setting store displays, keeping inventory, and directing personnel activity, such as hiring, firing, and training. TR 275. The VE then classified Plaintiff's previous work as a cashier as a "low-level, entry-level semiskilled" job with a "light" exertional level. *Id.*

20

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff. TR 292. The ALJ then asked the VE if an individual, limited to sedentary work, would be able to perform any of Plaintiff's past relevant work, all of which was at a light exertional level. *Id.* The VE testified that the hypothetical claimant would not be able to perform Plaintiff's past relevant work. *Id.*

The ALJ told the VE to assume that the hypothetical individual was "limited to occasional postural activities, climbing, balancing, stooping, crouching, kneeling, and crawling," and was "required to exercise the sit/stand option at will." TR 292-293. The ALJ then asked the VE what jobs would be available for such an individual in the Tennessee regional economy, and in what numbers. TR 293. The VE testified that the position of a machine operator would be available to the individual, and that there were approximately 1,000 positions in the Tennessee economy and 141,000 positions in the national economy. *Id.* The VE testified that the position of a surveillance system monitor would also be available to the individual, and that there were approximately 500 positions in the Tennessee economy and 4,500 positions in the national economy. *Id.* The VE testified that the position of a cashier would additionally be available to the individual, and that there were approximately 3,000 positions in the Tennessee economy and 140,000 positions in the national economy. *Id.* The VE further testified that the position of a handpacker would be available to the individual, and that there were approximately 600 positions in the Tennessee economy and 7,500 positions in the national economy. *Id.* The VE finally testified that the position of an inspector would be available to the individual, and that there were approximately 800 positions in the Tennessee economy and 14,000 positions in the national economy. *Id.*

The ALJ queried whether an additional restriction on climbing would impact the availability of the VE's enumerated positions. TR 293. The VE responded that such a restriction

21

would not impact the availability of the stated positions.  *Id.*  The ALJ then asked the VE what the impact would be on those jobs if an individual was limited to "no postural activities, no climbing, balancing, stooping, crouching, kneeling, [or] crawling."  *Id.*  The VE answered that there would be "no impact."  TR 294.

The ALJ asked the VE, "Assume the [hypothetical individual was] right hand dominant and there [was] a limitation on the left arm and hand, occasional gripping, what, if any, [*sic*] impact on the jobs that you've mentioned?"  TR 294.  The VE testified that the number of available cashier and assembler positions would be reduced by approximately three-quarters.  *Id.*  The ALJ then asked, "If I stated it differently and indicated occasion[al] handling, fingering, [and] feeling, would the answer to the question be the same or different?"  *Id.*  The VE testified that her answer would remain the same.  *Id.*

The ALJ next asked the VE if the availability of the stated positions would be impacted assuming that the individual had loss in the extreme left peripheral field of vision.  TR 294.  The VE testified that the position as a surveillance system monitor would be impacted if the job involved a panoramic view of monitors surrounding the individual.  *Id.*  The VE further stated that a surveillance monitor position involving "a one system monitor," that is, where the individual looked only directly ahead, would not be impacted.  *Id.*  Of the 500 surveillance system monitor positions in Tennessee, the VE stated that approximately one-third would be reduced as a result of the need for intact peripheral vision.  TR 295.

The ALJ also asked the VE if there would be any impact on the jobs mentioned assuming the individual suffered "mild" loss of concentration, persistence, and pace due to pain or any other reason.  TR 295.  The VE responded that there would not be any impact assuming "moderate" loss. *Id.*  The ALJ asked the VE to assume "severe or marked" loss.  *Id.*  The VE responded that all jobs

22

would be "concluded [*sic*]."  *Id.*

The ALJ asked the VE whether lying down during the work day, other than at breaks, for medical reasons, would be compatible with work activity.  TR 295.  The VE stated that it would not be compatible with the articulated positions, except for the surveillance system monitor position, which often included a sit, stand, and lying down option.  *Id.*

The ALJ asked the VE what the impact on the availability of the jobs mentioned would be, assuming the ALJ found Plaintiff's testimony fully credible.  TR 295.  The VE answered that she did not know how to respond to the question.  *Id.*

Plaintiff's attorney also examined the VE.  TR 295.  Plaintiff's attorney asked the VE, "If the claimant does not have bilateral manual dexterity because of numbness in one hand, does that reduce the number of handpacker [and inspector] jobs available?"  TR 295-296.  The VE testified that the availability of the handpacker positions would be impacted, but not necessarily the availability of the inspector positions.  TR 296.  The VE later stated that the number of available handpacker positions would be reduced by approximately one-third.  *Id.*  The attorney asked the VE whether most "inspector type" jobs required some manipulation of the product in order for examination.  *Id.*  The VE responded that there would be some manipulation and fine manual dexterity, but for the most part, such jobs involved "eyeball inspections."  *Id.*

The ALJ asked the VE whether the availability of the handpacker positions would be impacted, and the numbers reduced, because of the attorney's terminology "bilateral manual dexterity," or whether it was also impacted with the ALJ's prior question involving "limited occasion gripping, handling, fingering, or feeling in the left hand."  TR 296.  The VE testified that the numbers for the handpacker or packaging positions would be reduced because of the terminology "bilateral manual dexterity."  TR 297.

23

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to 4 types of evidence:  (1)

Case 3:02-cv-00415   Document 18   Filed 07/28/05   Page 24 of 29 PageID #: 24

objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[9] or its equivalent.  If a listing is met or

---

[9]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages 4 and 5 above, the Commissioner is required to consider the combined effect of all the claimant's

26

impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ "failed to abide by the only available Residual Functional Capacity Assessment - Mental and failed to explain why he did not give its contents credence." Docket Entry No. 14.  Accordingly, Plaintiff argues that the ALJ's decision was not supported by substantial evidence, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision should be reversed and Plaintiff should be awarded benefits.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g).  *See also* 42 U.S.C. 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

Although Plaintiff seeks an immediate award of benefits, the record before this Court does not establish that Plaintiff is entitled to benefits.  The record in the case at bar is replete with doctors' evaluations, medical assessments, test results, and the like, which were properly

27

considered by the ALJ, and which constitute substantial evidence to support his decision. Accordingly, the undersigned cannot conclude that the ALJ's "decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery*, 771 F.2d at 973.

As has been noted, Plaintiff in the case at bar maintains that the ALJ "failed to abide by the only available Residual Functional Capacity Assessment - Mental and failed to explain why he did not give its contents credence." Docket Entry No. 14.

On September 2, 1999, Dr. Regan completed a Mental Residual Functional Capacity Assessment regarding Plaintiff. TR 175-178. In that assessment, Dr. Regan opined that Plaintiff was "moderately limited" in her ability to "maintain attention and concentration for extended periods," her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace and without an unreasonable number and length of rest periods," and her ability to "respond appropriately to changes in the work setting." TR 175-176. Dr. Regan further opined that Plaintiff was "markedly limited" in her ability to "understand and remember detailed instructions and to carry out detailed instructions," her ability to "carry out detailed instructions," and her ability to interact appropriately with the general public." *Id.*

The ALJ, in his decision, did not discuss Dr. Regan's Mental Residual Functional Capacity Assessment. In fact, the ALJ's decision, while quite detailed, does not even mention Dr. Regan's assessment. Although Plaintiff incorrectly asserts that the ALJ must "abide by" Dr. Regan's assessment, Plaintiff is correct in her assertion that the ALJ must articulate the basis for his decision: the ALJ must "fully and fairly develop the administrative record" *(Johnson v. Secretary*, 794 F.2d 1106, 1111 (6th Cir. 1986)), and, in doing so, must identify the reasons and

28

basis for crediting or rejecting certain items of evidence (*see, e.g., Morehead Marine Services v. Washnock*, 135 F.3d 366, 375 (6th Cir. 1998); *Hurst*, 753 F.2d at 519), as there can be no meaningful judicial review without an adequate explanation of the factual and legal basis for the ALJ's decision (*Hyatt Corp. v. N.L.R.B.*, 939 F.2d 361, 367 (1991)).

Because the ALJ did not even mention the September 2, 1999 Mental Residual Functional Capacity Assessment in his decision, the undersigned cannot determine whether the ALJ considered Dr. Regan's assessment when he found that Plaintiff had "a moderate loss of ability to sustain concentration, persistence, and pace due to pain." TR 25. Remand is therefore appropriate.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that this action be REMANDED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

E. CLIFTON KNOWLES
United States Magistrate Judge

29